## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. CR-22-119-R |
| | ) |
| WARSAME ABIRAHMAN ALI and | ) |
| DAUD HASSAN JABRIL, | ) |
| Defendants. | ) |

## ORDER

On March 23, 2023, the Court heard argument regarding Defendant Ali's Motion to Suppress Evidence.[1] (Doc. No. 44). At the conclusion of that hearing, the undersigned ordered the parties to submit proposed findings of fact and conclusions of law, and the parties have complied. (*See* Doc. Nos. 96, 101). Upon consideration of the filings, the Court DENIES Defendant's Motion to Suppress Evidence.

### I.    The Traffic Stop

On the morning of January 27, 2022, Oklahoma County Sheriff's Deputy Kevin Johnson conducted a traffic stop on a white 2021 Jeep Compass heading eastbound on Interstate 40 near Douglas Boulevard. (Doc. No. 80, at 13:15-18, 14:13-15). The driver of the vehicle was Defendant Warsame Abirahman Ali; the lone passenger was Defendant Daud Hassan Jabril. (Doc. No. 80, at 14:22-23). After approaching the vehicle, Deputy Johnson explained to the occupants that he had stopped them because they were speeding

---

[1] Co-Defendant Jabril has adopted Ali's Motion. (Doc. No. 62).

in a construction zone.[2] (Doc. No. 80, at 16:10-15).   To maintain officer safety and effectively communicate on the side of a busy roadway, Deputy Johnson asked Ali to exit the vehicle and meet him behind the jeep; Ali complied with Johnson's request. (Doc. No. 80, at 17:11-18:11).

Standing behind the jeep, Ali produced a Virginia driver's license and explained that while Jabril had rented the jeep, he was authorized to drive it. ("Johnson Body Cam" conventionally filed as Doc. No. 54-1, 1:18-1:31; Doc. No. 80, at 17:2-4). Deputy Johnson responded by inquiring into Defendants' travel plans. Ali explained that he had flown to Phoenix from Virginia to visit Jabril for several days, and that he and Jabril were now driving to Virginia to visit Ali's family. (Doc. No. 80, at 18:16-21). Johnson found this unusual, as it would seem more efficient for Jabril to have simply gone to Virginia to visit Ali and his family. (Doc. No. 80, at 18:22-19:6). As Ali spoke, Johnson noticed that he appeared to be "shifting his weight" and "break[ing] eye contact." (Doc. No. 80, at 20:12-18, 61-63). Johnson then asked Ali to wait while he went to speak with Jabril to obtain the rental agreement. (Doc. No. 54-1, at 3:10-3:30).

While Jabril searched for the rental agreement, Deputy Johnson engaged him in conversation regarding Defendants' travel plans. Jabril told Johnson that they had driven to Oklahoma City to visit a friend and were now going to Little Rock to see another friend. (Doc. No. 80, at 22:8-14). Deputy Johnson testified that when he inquired as to how Ali arrived in Arizona, Jabril informed him that he had gone to Virginia to pick Ali up, and

---

[2] Speeding in a construction zone is a violation of Okla. Stat. tit. 47, § 11-806.

that they had driven back to Phoenix together. (Doc. Nos. 54-1, at 4:30-4:48; 80, at 22:4-8). Johnson found this "big discrepancy" alarming as Ali said he had flown to Phoenix. (Doc. No. 80, at 83:3-7). When Johnson inspected the rental agreement, he noticed that the vehicle appeared to be several days overdue to be returned. (Doc. Nos. 54-1, at 4:52-5:44; 80, at 21:22-22:3). During their conversation, Jabril appeared to be nervous and breathing rapidly. (Doc. No. 80, at 102:11-16).

At this time—approximately five minutes into the stop—Deputy Johnson returned to attend to Ali still standing on the shoulder of the interstate. (Doc. No. 54-1, at 5:50). Johnson instructed Ali to sit in the backseat of the police vehicle while Johnson ran his information. (Doc. Nos. 54-1, at 5:52-6:28; 80, at 68:10-15). Upon entering the vehicle, Deputy Johnson radioed for "the closest available K-9." (Doc. Nos. 54-1, at 6:33-6:52; 80, at 22:23-25). Johnson then began to examine Ali and Jabril's driver's licenses while continuing to engage Ali in conversation regarding the pair's travel plans and Ali's place of employment. (Doc. No. 54-1, at 7:30-8:43). During the course of their discussion, Ali asked Johnson about his mobile computer which Ali could see from the backseat: specifically, why Deputy Johnson had selected, from a drop-down menu on his mobile computer in the "PlateLink Query" program, "[p]late associated with narcotics trafficking or bulk cash smuggling" as his "reason" for running the jeep's license plate. (Doc. No. 54-1, at 8:45-9:40). While Johnson explained that he had to input a reason to run a license plate search, he called the Oklahoma County dispatch to verify Ali's driver's license.[3]

---

[3] Johnson used his cell phone to call the Oklahoma County dispatch to verify Ali's license because his mobile computer was not working properly. (Doc. No. 80, at 24:19-25:3).

(Doc. No. 54-1, at 9:40-13:34). While Johnson waited for dispatch to verify Ali's license, Sergeant Kyle Dake of the Oklahoma City Police Department arrived on the scene with his state-certified K-9, "Dirk." (Doc. Nos. 54-1, at 11:08; 80, at 25:10-13, 26:10-14). Two minutes later, dispatch notified Johnson that they were unable to verify Ali's license. (Doc. No. 54-1, at 13:28-34).

Following this exchange with dispatch, Johnson asked Ali whether his license was "real" and when he obtained it. (Doc. No. 54-1, at 13:34-13:52). Johnson then began to question Ali as to whether there were any weapons, illegal narcotics, or large sums of cash stored in the vehicle to which Ali replied that there were not. (Doc. No. 54-1, at 13:52-14:07). When asked whether he would consent to a search of the vehicle, Ali replied "I don't consent to a search." (Doc. No. 54-1, at 14:07-14:23). Johnson then exited his police vehicle and approached the jeep with Sergeant Dake to ask Jabril the same questions. (Doc. No. 54-1, at 15:30-16:36). When Jabril was asked whether he would consent to a search, Jabril shook his head and refused. (Doc. Nos. 54-1, at 16:19-16:25; 80, at 27:6-12). He was then escorted to the back seat of Dake's police vehicle. (Doc. No. 80, at 27:24-28:2).

Sergeant Dake subsequently retrieved "Dirk" and began to walk him around the vehicle to conduct a sniff—Dirk alerted next to the front passenger-side door.[4] ("Dake Body Cam" conventionally filed as Doc. No. 54-2, at 5:30; 80, at 28:3-7). After Dirk alerted on the vehicle, the officers conducted a search of the vehicle. (Doc. No. 80, at 28:8-10).

---

[4] Although Sergeant Dake explained that he no longer speaks to Dirk while a sniff is conducted, the Court notes that Dake did not speak to him for most of the sniff, and that the dog appeared to stand at alert for about thirty seconds before Sergeant Dake ended the sniff and said "good boy!" (Doc. Nos. 54-2, at 5:11-5:41; 80, at 144-45).

During the search, officers located several pounds of pills, later confirmed to be fentanyl, underneath the front passenger seat, and a package of marijuana residue "in the front passenger door pocket," which was "basically right where [Dirk] alerted." (Doc. No. 80, at 125, 127:16-21). Defendants were subsequently placed under arrest and the jeep was transported to the Criminal Interdiction Team of Central Oklahoma (CITCO) office. (Doc. No. 80, at 127:22-25).

The Fourth Amendment guarantees the right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop constitutes a seizure within the meaning of the Fourth and Fourteenth Amendments, thus, it must be reasonable and extend no longer than necessary to accomplish its purpose. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *Rodriguez v. United States*, 575 U.S. 348, 354 (2015); *United States v. Moore*, 795 F.3d 1224, 1228 (10th Cir. 2015). When stopped by police officers, motorists generally expect that the encounter will be brief, and that they will be allowed to continue on their way with or without a citation. *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984). In *Moore*, the Tenth Circuit Court of Appeals summarized the basic rules of a proper traffic stop.

> As part of a routine traffic stop, an officer "may request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Caro*, 248 F.3d 1240, 1244 (10th Cir. 2001); *see also Rodriguez*, 575 U.S. at 355. An officer may also generally inquire about the driver's travel plans, *see United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001), and ask questions, whether or not related to the purpose of the stop, so long as they do not prolong the stop, *see United States v. Simpson*, 609 F.3d 1140, 1146 n. 1 (10th Cir. 2010). But "[o]nce an officer returns the driver's license and registration, the traffic stop has ended and questioning must cease; at that point, the driver must be free to leave." *United States v. Villa*, 589 F.3d 1334, 1339 (10th Cir. 2009).

Case 5:22-cr-00119-R   Document 116   Filed 04/10/23   Page 6 of 10


*Moore*, 795 F.3d at 1228-29. If, however, an officer has an objectively reasonable and articulable suspicion of criminal activity—"more than an inchoate and unparticularized suspicion or hunch"—a stop may be extended beyond its original purpose. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks omitted); *see also United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998). Courts determine whether an officer had reasonable suspicion to extend a stop based on the totality of the circumstances viewed from the standpoint of an objectively reasonable police officer. *United States v. Lopez*, 518 F.3d 790, 797 (10th Cir. 2008).

Here, the Court finds that the traffic stop was reasonable—Deputy Johnson observed and paced the vehicle for more than two miles at 60 miles per hour ("mph") in a construction zone with a speed limit of 45 mph. (Doc. No. 80, at 13, 45-50). Moreover, Johnson's general inquiry into Defendants' travel plans did not unreasonably prolong the stop as he noticed significant discrepancies in travel narratives while pursuing the traffic-based mission of the stop. While Ali asserted, numerous times, that he had flown to Phoenix, Jabril stated that he had driven Ali from Virginia to Phoenix. Additionally, Jabril told Deputy Johnson that they had come to Oklahoma City to meet one of Ali's friends, yet Ali never mentioned a friend in Oklahoma City.[5] (Doc. No. 80, at 83-84). Although Defendants argue that these inconsistencies were minor and insignificant in the overall context of the stop, inconsistencies in travel plans may give rise to reasonable suspicion. *See e.g., United States v. Wood*, 106 F.3d 942, 947 (10th Cir. 1997) ("As with unusual

---

[5] Jabril could not remember the name of Ali's friend. (Doc. No. 80, at 83-84).

travel plans, inconsistencies in information provided to the officer during the traffic stop may give rise to reasonable suspicion of criminal activity.") Paired with Ali's "furtive movements," Jabril's nervousness, and the fact that the rental vehicle appeared to be overdue to be returned, the Court concludes that an objectively reasonable officer would have reasonable suspicion of criminal activity. (Doc. No. 80, at 23, 109-11).

Additionally, the Court finds that Deputy Johnson detained Defendants for a reasonable time to allow for Sergeant Dake to arrive—eleven minutes into the stop—and deploy Dirk to conduct the dog sniff. (Doc. No. 54-1, at 11:08); *see United States v. Mendoza*, 468 F.3d 1256, 1261 (10th Cir. 2006) ("Officers with reasonable suspicion to believe that the occupants of a vehicle are engaged in the unlawful transportation of contraband may detain the vehicle for a reasonable time to obtain a properly trained dog to sniff for contraband."); *see also United States v. Morales-Zamora*, 914 F.2d 200, 205 (10th Cir. 1990) ("[P]olice officers do not need an individualized reasonable suspicion of drug-related criminal activity before subjecting a vehicle lawfully detained to a dog sniff.").

Although Defendants contend that Dirk's alert was "so subjective that only the handler [was] able to identify it," Dirk plainly stopped at the front passenger-side door and "pointed" for about thirty seconds signaling an alert. (Doc. Nos. 54-2, at 5:09-5:41; 101, at 16, ¶ 24). The Court concludes that the state-certified canine's alert was reliable and that the officers had probable cause to search the jeep.[6] (Doc. No, 80, at 119-20, 122); *see e.g.,*

---

[6] While Dirk was not trained to detect fentanyl, he was state-certified and trained to detect the odor of marijuana. (Doc. No. 80, at 122). A bag containing marijuana residue was recovered "in the front passenger door pocket." (Doc. No. 80, at 127, 136-37, 167-68).

*Florida v. Harris*, 568 U.S. 237, 246–47 (2013) ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.").

To the extent that Defendants argue that Deputy Johnson and Sergeant Dake violated police department policies by removing their body cameras during the roadside search, the Court concurs with the Government. (Doc. No. 80, at 92-93, 102, 161-63). The Court's analysis of whether a Fourth Amendment violation occurred cannot turn on local law enforcement practices and procedures. *See Whren v. United States*, 517 U.S. 806, 815 (1996) (holding that police practices do not affect a Court's Fourth Amendment analysis because "police enforcement practices, even if they could be practicably assessed by a judge, vary from place to place and from time to time." "[T]he search and seizure protections of the Fourth Amendment" cannot be so variable and "made to turn upon such trivialities."); *Virginia v. Moore*, 553 U.S. 164, 172 (2008) ("We thought it obvious that the Fourth Amendment's meaning did not change with local law enforcement practices— even practices set by rule.").

## II.    The Warrantless Search of the Vehicle at the CITCO Office

After the discovery of several pounds of pills, officers brought the jeep to the CITCO office to search it more thoroughly. Defendants contend that the search at the CITCO office was unlawful because officers did not obtain a warrant, there were no exigent circumstances, and no warrant exception applied. (Doc. No. 44, at 8-9). The Supreme Court has held, however, that "when police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may

conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." *Michigan v. Thomas*, 458 U.S. 259, 261 (1982) (citing *Chambers v. Maroney*, 399 U.S. 42 (1970)); *see also Texas v. White*, 423 U.S. 67 (1975) (holding that a warrantless search of an impounded vehicle at a station house was constitutional).

Here, Defendants were stopped on a busy interstate. A probable cause search of Defendants' jeep on the shoulder of the interstate yielded several pounds of pills that officers suspected were fentanyl. By transporting the jeep to the CITCO office, officers were able to continue searching the vehicle in a safe and efficient manner. (Doc. No. 80, at 128). Although the vehicle was securely impounded, justification to conduct a warrantless search of a vehicle "does not vanish once the car has been immobilized." *Thomas*, 458 U.S. at 261. Thus, the Court concludes that the search at the CITCO office was a continuation of the probable cause search initiated on Interstate 40. (*See* Doc. No. 80, at 173-74).

### III.   Conclusion

As set forth above, the Court concludes that the traffic stop was reasonable, and that Deputy Johnson had reasonable suspicion based on the totality of the circumstances to extend the stop and call for Sergeant Dake and his state-certified canine. The dog reliably alerted on the vehicle, and the subsequent search, begun on the side of Interstate 40 and continued at the CITCO office, was lawful. For the reasons set forth herein, Defendant Ali's Motion to Suppress Evidence (Doc. No. 44) is DENIED.

**IT IS SO ORDERED** this 10th day of April 2023.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE